IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CT-3050-BO

FILED
AUG 2 0 2008
DENNIS P. IAVARONE, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

| | |
|---|---|
| RONNIE DOUGLAS BROWN, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| NCDOC, et al., ) | |
| Defendants. ) | |

Ronnie Douglas Brown, an inmate in the custody of North Carolina, filed a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendant William Johnson's motion to dismiss, and defendants Boyd Bennett, Gerald Branker, and Dana Metz' motion for summary judgment.[1] Brown has responded to the pending motions, and the matters are ripe for determination.

Plaintiff claims his rights were violated because: 1) he did not receive adequate medical care for diabetes related vision problems while incarcerated in the Pitt County Detention Center ("PCDC"); and 2) he did not receive adequate medical care for diabetes related vision problems while incarcerated in the Department of Correction ("DOC"). Because of the allegedly deliberate indifference to his serious medical condition he contends he is blind. Plaintiff argues that because of the delay in the medical care he became completely blind in his left eye and partially blind in his right eye. He asserts that prior to his arrest, he had been diagnosed with diabetes and was seeing a specialist at the Veterans' Administration Hospital in Durham, North Carolina. He contends he received laser surgeries and steroid injections to prevent blindness and responded well to treatment.

---

[1] Defendant Metz was erroneously impleaded as Mint and defendant Branker was erroneously impleaded as defendant Brooks.

## FINDING OF FACT

i.  <u>Medical care and relevant findings during custody</u>

On October 20, 2003, plaintiff was arrested and placed in Pitt County Detention Center. On March 4, 2004, pursuant to a state court safekeeping order plaintiff was transferred to Raleigh for "medical reasons." The order further reflected that conversations relating to plaintiff's medical issues were to be conducted between PCDC medical staff and Central Prison medical staff. The order specifically named nurse Janet Gable, LPN, as the contact person at PCDC.

Plaintiff's safekeeper admission form indicates the existence of "various medical issues." On March 5, 2004, at 11:20 am, the Central Prison Emergency Department evaluated plaintiff. Plaintiff stated he had diabetes and hypertension. After verification of plaintiff's medications by Janet Gable, LPN, a DOC physician wrote orders for medications and then transferred him to regular custody. According to the medical records, plaintiff was in no apparent distress. On March 5, 2004, plaintiff received an initial health screening. Plaintiff stated he received treatment for hypertension and diabetes and wore eyeglasses. On March 8, 2004, a rush request was submitted to the DOC Utilization Review Department for elavil, an antidepressant. The request was denied only because the medication does not require UR approval.

On March 24, 2004, plaintiff submitted a sick call request stating his eyes were getting dimmer and he could hardly see. On March 25, 2004, plaintiff was seen by a nurse who noted the need for referral to the Ophthalmology Clinic. Plaintiff submitted additional sick call requests regarding his eye sight on March 25th, March 28th, March 31st, April 1st, and April 5th, 2004. On March 29, 2004, a physician assistant ordered plaintiff to be referred to the eye clinic.

2

On March 30, 2004, the DOC Utilization Review Department received a rush request for an ophthalmology consultation at Duke University Eye Center. The request noted "unspecified visual disturbance," and the request was approved on the same day. On April 7, 2004, plaintiff was seen on sick call and the attending nurse noted that an ophthalmology appointment was scheduled for May 2004. It appears that plaintiff did not go to the scheduled appointment due to his transfer back to PCDC for sentencing.

Plaintiff submitted additional sick call requests in April 2004 but did not state he was having vision problems. On April 16, 2004, plaintiff was released form DOC custody to appear in the Criminal Superior Court for Pitt County. He returned to DOC custody on May 5, 2004, when he was readmitted at Central Prison. The medical transfer summary that PCDC provided listed plaintiff's medications, but did not indicate vision problems. Upon his readmittance, another medical screening was conducted. On May 6, 2004, the attending physician ordered an ophthalmology consultation. The consultation note stated that plaintiff was legally blind due to diabetic retinopathy and was marked "rush." The request was approved. The form also notes an appointment scheduled for June 3, 2004 at 9:45.

On May 20, 2004, plaintiff was transferred to Harnett Correctional Institution, where he submitted sick call request complaining about eye damage from diabetes. On May 21, 2004, the prison doctor noted plaintiff was legally blind as a result of diabetic retinopathy. On May 25, 2004, plaintiff signed an agreement form consenting to be seen in the Central Prison Ophthalmology Clinic.

On June 3, 2004, plaintiff was seen at the Central Prison clinic. The physician's notes reflect that plaintiff had experienced poor vision for years and decreased vision in his left eye in October 2003. The physician ordered that plaintiff be seen at the Duke Eye Center.

ii.  Dr. Martin's affidavit and exhibits

    a.  Retinopathy

Dr. Martin's affidavit and exhibits, which include medical records prior to plaintiff's incarceration, show plaintiff suffers from diabetes. Dr. Martin is a licensed physician, board-certified in ophthalmology, and in his current practice he specializes in diseases and disorders of the retina and vitreous matters. Dr. Martin's discussion of retinopathy is helpful to the court. He explains the condition as follows: retinopathy is a risk when suffering from either Type I or Type II diabetes. Diabetic retinopathy is a major cause of blindness, and its degree is related to both the duration of the diabetes and its stability, or degree of control. Retinopathy develops slowly over the course of years, not weeks or a few months. Two types of diabetic retinopathy are recognized, nonproliferative and proliferative. Nonproliferative retinopathy, also know as background retinopathy, does not manifest visual symptoms until compromised vascularity occurs in the retina. Treatment of diabetic retinopathy includes control of the underlying diabetes and blood pressure. Annual retinal examinations by an ophthalmologist are recommend. Laser treatment may also be helpful in slowing the progression of background retinopathy.

    b.  Medical treatment/condition before incarceration

Medical records prior to plaintiff's incarceration show that in early 2002 plaintiff's main complaint was diabetic retinopathy of a seven month duration. Plaintiff had an examination seven months prior. Physician progress notes of April 23, 2002, indicated a history of diabetes

4

for five years. Plaintiff's baseline vision was blurry due to retinopathy and retinal hemorrhages existed. Plaintiff came to the clinic in April of 2002 for laser correction of retinopathy. His diabetes was also poorly controlled as early as 1998, and he had been off his prescribed medications for the preceding two weeks of April 2002.

On May 30, 2002, the physician noted that plaintiff had severe diabetic retinopathy and clinically significant diabetic macular edema. On May 30, 2002, he underwent laser surgery. His uncorrected right eye vision was 20/40, -1, and his uncorrected left eye vision was 20/70, -2.

On July 30, 2002, plaintiff was seen as a new patient at Primary Care Greenville Clinic. The examining physician's notes show plaintiff stated he has suffered from diabetes since 1983 and had both hypertension and erectile dysfunction. It is also noted that plaintiff stated he has decreased eye site.

In early August 2002 plaintiff's eyes were examined again. His uncorrected right eye vision was 20/50, +2, and his uncorrected left eye vision was 20/100, +2. It was noted that plaintiff had severe nonproliferative diabetic retinopathy and severe swelling of the macula. Additionally, exudates were noted. This constitutes weak capillaries at the back of the eye causing leaking of fluids, cholesterol, and lipids. Plaintiff underwent a fluorescein angiogram of his eyes. The findings were poor purfusion which refers to circulation in tissue at the back of the eye. "Poor perfusion" means the tissue cannot function properly because of the markedly diminished volume of blood. The physician noted doubt that additional laser surgery would be helpful.

By December 6, 2002, plaintiff had begun insulin injections. Plaintiff was scheduled to return to Durham for an eye examination on February 7, 2003, but the records do not show

whether this occurred. On March 5, 2003, physician's notes show no improvements from the insulin treatments. On July 31, 2003, Based on plaintiff's diabetic retinopathy he was declared disabled by the Social Security Administration. Further, a diabetic foot examination revealed mycotic toenails, a sign of infection associated with diabetes. Better insulin control had not improved plaintiff's diabetes. Lastly, plaintiff's medical records from 2002 to 2003 show plaintiff additionally suffers from diabetic nephropathy (kidney disease), proteinuria (excessive protein in the urine), blood in his stools and erectile dysfunction. Erectile dysfunction is a condition frequently associated with diabetic vascular insufficiency. Due to the severity of his diabetic condition, treatment of the erectile dysfunction did not work. Plaintiff is anemic and takes medication for poor peripheral circulation, all of which are symptoms of severe diabetes.

## LEGAL DISCUSSION

i.  William Johnson's Motion to Dismiss

Rule 12(b)(6) allows a suit to be dismissed for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion to dismiss only determines whether a claim is stated; it does not resolve disputed facts, the merits of the claim, or applicability of defenses. Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 1356 (1990)). A complaint should not be dismissed unless it clearly appears that the plaintiff can show no set of facts which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 46-47 (1957). Indeed, a court should not dismiss a complaint that states a claim, even if it appears that the chance of recovery is remote. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982). For the purposes of ruling on a Rule 12(b)(6) motion to dismiss, the court should

construe allegations in the complaint as true and taken in the light most favorable to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969); Republican Party, 980 F.2d at 952.

a.  Failure to Exhaust

Defendant Johnson argues that the claim is not exhausted because he is not named within the grievance. The United States Supreme Court in Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910 (2007), rejected the argument that a plaintiff is required to specifically plead exhaustion. The Court states exhaustion is an affirmative defense that must be properly raised and proven by the defendant. Jones, 549 U.S. at ___, 127 S. Ct. at 919; see also Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 681 (4th Cir. 2005). Further, in an apparent departure from the earlier holding in Porter v. Nussle, 534 U.S. 516, 532 (2002), the Supreme Court held that "[e]xhaustion is not *per se* inadequate [under the PLRA] simply because an individual later sued was not named in the grievance." Jones, 549 U.S. at ___, 127 S. Ct. at 923; see also Johnson v. Johnson, 385 F.3d 503, 517 ("Beyond those general practical considerations, the prison system's own rules regarding grievance provide both inmates and the courts with more specific guidance."). The reviewing court should look to the grievance policy to help determine if the requirements of exhaustion have been met. Id. In reviewing the North Carolina Administrative Policy, there does not appear to be a requirement to name a specific defendant, nor does defendant set out and detail the North Carolina Administrative Policy. Therefore, in light of the ruling in Jones, this court does not find defendant has provided sufficient evidence to establish that plaintiff failed to exhaust his administrative remedies. Defendant's motion to dismiss based on the failure to exhaust is denied.

7

b. Statute of Limitations

There is no federal statute of limitations for actions brought under 42 U.S.C. § 1983. Instead, the analogous state statute of limitations applies. Burnett v. Grattan, 468 U.S. 42, 49 (1984). Specifically, the state statute of limitations for personal injury actions governs claims brought under 42 U.S.C. § 1983. Wilson v. Garcia, 471 U.S. 261, 276 (1985). North Carolina has a three-year statute of limitations for personal injury actions. N.C. Gen. Stat. § 1-52(5)(2005); see Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996); National Advertising Co. v. City of Raleigh, 947 F.2d 1158, 1161 (4th Cir. 1991).

Although the statutory limitation period for claims brought under section 1983 is borrowed from state law, the time for accrual of an action is a question of federal law. Brooks, 85 F.3d at 181. A claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action. Id.

Here the original complaint was filed on May 4, 2006. The amended complaint was filed on August 13, 2007. The basis of this complaint were for events occurring from October 20, 2003, through approximately June of 2004 at PCDC and within the DOC, therefore the original complaint was timely filed. Therefore, it must be determined if the amended complaint satisfies the relation back doctrine.

The court finds that the amended complaint arises from the same set of operative facts as set out in the original complaint. Fed. R. Civ. P. 15; Louisiana Wholesale Drug Co., Inc. V. Biovail Corp., 437 F. Supp. 2d 79 (D.D.C. 2006). The court further finds the party was on notice and the statute of limitations does not bar claims against Defendant Johnson. Id. Therefore, the

amended complaint is found to have been timely filed. Defendant's motion to dismiss based on a bar by the statute of limitations is denied.

    c.    Failure to Comply with North Carolina Rule of Civil Procedure 9(J) Certification

If plaintiff was attempting to file a medical malpractice suit or medical negligence claim pursuant to North Carolina State law the claim fails and is dismissed. The state statute provides:

> Medial malpractice - Any complaint alleging medical malpractice by a health care provider as defined in G.S. 90-21-11 in failing to comply with the applicable standard of care under G.S. 90-21.12 shall be dismissed unless:
> (1) The pleading specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;
> (2) The pleading specifically asserts that the medical care has been reviewed by a person that the complainant will seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or
> (3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.
> N.C. Gen. Stat. § 1A-1, Rule 9.
>
> N.C.G.S. § 90-21.11 states:
> As used in the Article the term "health care provider" means without limitation any person who pursuant to the provisions of Chapter 90 of the General Statutes is licensed, or is otherwise registered or certified to engage in the practice of or otherwise performs duties associated with any of the following: medicine, surgery, dentistry, pharmacy, optometry, midwifery, osteopathy, podiatry, chiropractic, radiology, nursing, physiotherapy, pathology, anesthesiology, anesthesia, laboratory analysis, rendering assistance to a physician, dental hygiene, psychiatry, psychology; or a hospital or a nursing home; or any other person who is legally responsible for the negligence of such person, hospital or nursing home; or any other person acting at the direction or under the supervision of any of the foregoing persons, hospital, or nursing home. As used in the Article, the term "medical malpractice action" means a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider.

9

> N.C.G.S. § 90-21.12 states the following regarding the applicable standard of health care:
> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

Plaintiff has not complied with the pleading requirements of N.C. Gen. Stat. §1A-1 Rule 9(j). Failure to comply with 9(j) is grounds for dismissal of a state medical malpractice claim brought in a federal district court. Frazier v. Angel Med. Ctr, 308 F. Supp.2d 671, 676 (W.D.N.C. 2004); Moore v. Pitt County Memorial Hosp., 139 F. Supp.2d 712, 713 (E.D.N.C. 2001); Estate of Williams-Moore Alliance One Receivables Mgmt., 335 F. Supp.2d 636, 649 (M.D.N.C. 2004). Defendant's motion to dismiss any state law claim for medical malpractice is allowed.

ii.   Benntt, Branker, and Metz' Motion for Summary Judgment

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted & emphasis removed). A trial court reviewing a summary judgment motion should determine whether a

genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. The court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. See Matsushita, 475 U.S. at 587.

Defendants assert the defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Saucier v. Katz, 533 U.S. 194, 202 (2001). Qualified immunity protects government officials "where the law is unsettled or murky." See Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001). The test is whether the act was clearly forbidden, not whether in hindsight the action was wrongful. See id. The first step in evaluating qualified immunity is to determine whether the plaintiff has alleged the deprivation of a constitutional right. Id.

Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.[2] Estelle v. Gamble, 429 U.S. 97, 105-106 (1976). In order to be liable, the official must have actual knowledge or awareness of the need. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The indifference must be objectively harmful enough to establish a constitutional violation. See id. at 837–40. The court can rely on the medical affidavits and prison medical records in ruling on a motion for summary judgment. See generally, Stanley v. Hejirika, 134 F.3d 629, 637-38 (4th Cir. 1998); Marshall v.

---

[2] To state a claim for inadequate medical care under Bivens, a plaintiff must show deliberate indifference to his serious medical needs in violation of his Eighth Amendment right, if the individual is an incarcerated prisoner, and his Due Process rights, if the individual is a pretrial detainee. See Estelle v. Gamble, 429 U.S. 97 (1976). The standard under the Eighth Amendment and Due Process is the same.

11

Odom, 156 F. Supp. 2d 525, 530 (D. Md. 2001); Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982).

Delay in medical care, with no resulting injury, does not violate the Eighth Amendment. See Strickler v. Waters, 989 F.2d 1375, 1380–81 (4th Cir. 1993); Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). A prisoner is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). Likewise, mere negligence in diagnosis or treatment does not state a constitutional claim. Estelle, 429 U.S. at 105–06.

While it is clear that plaintiff suffers from a serious medical condition, diabetes, as well as numerous medical complications due to his diabetes, the care he has received while in the custody of the DOC does not constitute deliberate indifference. The medical records indicate that prior to incarceration, plaintiff's vision problems had become significant and the benefit of additional laser surgery was questionable and not recommended. Plaintiff was transferred to the DOC as a safekeeper because of medical issues. Upon arrival into the DOC a medical evaluation was undertaken. The medical records indicate that ophthalmology appointments and referrals were made and the allowance of such was "rushed" by the medical staff and allowed by the utilization board. The 1 ½ months that plaintiff was in custody of the DOC without being given laser surgery did not cause or exacerbate his blindness.[3] Further, any dispute as to the course of treatment is not cognizable under 42 U.S.C. § 1983. Russell, 528 at 319; see also Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993); Davis v. Hall, 992 F.2d 151, 153 (8th Cir. 1993). Bennett, Branker, and Metz are cloaked with qualified immunity.

---

[3] In Dr. Martin's opinion, he stated "based on my education, training, and experience, it can be stated to a medical certainty that Plaintiff's risk of blindness from diabetic retinopathy was not caused or aggravated by the delay from March to June 2004 for his first retinal examination after admission to DOC custody."

12

Accordingly, defendants Bennett, Branker, and Metz's motion for summary judgment is ALLOWED and these defendants are dismissed from the action. Defendant Johnson's motion to dismiss is DENIED on the basis of exhaustion and statute of limitations. Defendant Johnson's motion to dismiss is ALLOWED to any state claim and any such claim is DISMISSED. Defendant William Johnson is given until September 15, 2008, to file any additional dispositive motions.

SO ORDERED. This the 18 day of August 2008.

TERRENCE W. BOYLE
United States District Judge